# EXHIBIT C

091505.txt

1

1  UNITED STATES DISTRICT COURT

2  DISTRICT OF CONNECTICUT

3

4  BROCK LESNAR,                )
                 Plaintiff,   )        NO: 3:05CV221(CFD)
                              )
5  vs.                         )
                              )
6  WORLD WRESTLING             )        September 15, 2005
   ENTERTAINMENT, INC.         )
7                 Defendant.   )
   —————————————————————————————

8

9                        HEARING

10                   450 Main Street
                  Hartford, Connecticut

11

   B E F O R E:
12        THE HONORABLE CHRISTOPHER F. DRONEY, U.S.D.J.

13

   A P P E A R A N C E S:
14

   For the Plaintiff      :    SCOTT S. CENTRELLA, ESQUIRE
15                              Diserio, Martin, O'connor &
                                Castiglioni
16                              One Atlantic Street
                                Suite 500
17                              Stamford, CT 06901

18

   For the Defendant      :    JERRY S. McDEVITT, ESQUIRE
19                              Kirkpatrick & Lockhart
                                1500 Oliver Building
20                              535 Smithfield Street
                                Pittsburgh, PA 15222

21

                                DANIEL SCHWARTZ, ESQUIRE
22                              Day, Berry & Howard
                                One Canterbury Green
23                              Stamford, CT 06901

24

   Court Reporter     :       Martha C. Marshall, RMR, CRR
25  Proceedings recorded by mechanical stenography, transcript
   produced by computer.


                        Page 1



091505.txt

2

```
 1          THE COURT:  Good afternoon.  This is the case of
 2   Brock Lesnar versus World Wrestling Entertainment, Inc.
 3   It's our civil action number 3:05CV221.
 4          If I have could have the appearances of counsel
 5   for the record, please.
 6          MR. CENTRELLA:  For the plaintiff, your Honor, my
 7   name is Scott Centrella from Diserio, Martin, O'Connor &
 8   Castiglioni.
 9          MR. McDEVITT:  Your Honor, for the defendant, my
10   name is Jerry McDevitt from Kirkpatrick & Lockhart.
11          MR. SCHWARTZ:  I'm Daniel Schwartz, your Honor,
12   from Day, Berry & Howard, also for the defendant in this
13   action.
14          THE COURT:  Thank you.  And I have the defendant
15   World Wrestling Entertainment, Inc.'s motion to compel.  Are
16   we ready to proceed with that?
17          MR. McDEVITT:  We are, your Honor.  I think
18   Mr. Centrella filed something.
19          MR. CENTRELLA:  I did.  I filed a memorandum in
20   opposition, your Honor, which I had Fed-Exed to your
21   chambers this morning hopefully.
22          THE COURT:  Yes, I got it.  You also have a motion
23   to seal too, right?
24          MR. CENTRELLA:  The motion to seal was filed by
25   Mr. McDevitt.
```

091505.txt

3

```
 1          MR. McDEVITT:  I think it was, your Honor.  It was
 2    a protective order we agreed to and I think that was
 3    filed.
 4          THE COURT:  But I haven't entered it, right?
 5          MR. CENTRELLA:  I don't believe you signed off on
 6    the protective order.
 7          THE COURT:  So that I do have to make a finding of
 8    good cause for the protective order.  So what I'm going to
 9    do is listen to what you have to say today, and then at the
10    end of the hearing I can let you argue about whether those
11    matters should be sealed.  I don't see anybody else in the
12    courtroom at this time.
13          MR. CENTRELLA:  That's fine.
14          THE COURT:  Are we ready to proceed then?
15          MR. McDEVITT:  We are, your Honor.
16          Your Honor, you've heard I gather some degree
17    in --
18          THE COURT:  Could you just pull that microphone
19    over a little bit, Mr. McDevitt?
20          MR. McDEVITT:  Your Honor, what I thought might be
21    helpful was to give a little bit of preview of our view of
22    this case to set out the discovery issues.
23          In our view what this case is about, it's not as
24    has been portrayed in summary judgment briefs, about
25    post-employment restrictions contained in an employment
```

091505.txt

4

```
 1   agreement.  What this is an attempt to do is to invalidate
 2   the explicitly stated material inducement given by
 3   Mr. Lester to my client in a settlement agreement that was
 4   reviewed both by him and his agent and Attorney David Olsen
 5   before signing.  And the whole settlement agreement was
 6   necessary because of Mr. Lesnar's refusal to perform a
 7   contract that had been entered into in the year 2003.  And
 8   there's really no serious question that that's what
 9   occurred.
10           THE COURT:   That's because he went off to play
11   football, right.
12           MR. McDEVITT:   Not because he went off to play
13   football, but because he refused to honor the terms of his
14   contract.  He made it very clear that he wasn't going to
15   perform and that he wanted to go play football.  And the
16   terms of that contract, where he refused to perform, I think
17   are critical to understand the substantive settlement
18   agreement.  My client liked professional football, baseball.
19   When they sign an athlete they sign them to exclusive
20   contracts, personal service contracts.  They perform
21   exclusively for the WWE.  And the WWE, in turn, invests a
22   lot of money in promoting them and staring them and make a
23   lot of money and hopefully drive ticket sales for my client.
24           The contract Mr. Lesnar signed and subsequently
25   refused to perform granted Worldwide, Worldwide, exclusivity
```

091505.txt

⬚

1   to his services and appearances at events or entertainment

2   programs.  It granted worldwide exclusivity for personal

3   appearances and for performances in non-wrestling events.

4   It granted worldwide exclusivity for merchandising rights to

5   items incorporating his name and likeness and was for seven

6   years, for which Mr. Lesnar received a guarantee of at least

7   a million dollars a year plus royalties.  So he had a

8   guaranteed deal which was going to pay him seven million

9   dollars in exchange for the exclusivities that I have

10  mentioned to you.

11          When he breached the contract and indicated he

12  didn't wish to perform it anymore, and there had been some

13  problems with Mr. Lesnar before he indicated that he wanted

14  to go off and play professional football, my client was in a

15  position where it had numerous remedies available to it

16  under the contract that it could have invoked.  It had, for

17  example, under the contract the right to suspend his

18  performance for the length of Mr. Lesnar's non-performance

19  and tack that on to the end of the contract.  It had the

20  right to forfeit any royalties that he would be due on the

21  sale of merchandise explicitly under the terms of the

22  contract.  And it could have went to court, if necessary, to

23  obtain an injunction against him performing for anybody else

24  in violation of his exclusivity.  Instead, what the parties

25  did, much like they would do in a regular lawsuit, is they

091505.txt

6

1    made a compromise.  And what Mr. Lesnar agreed to do in this
2    document we now know was reviewed by his counsel, David
3    Olson, and turned over in the privilege log and we saw this
4    and apparently had the advice of Mr. Olsen.  In this
5    settlement agreement, and that's what it is, Mr. Lesnar
6    acknowledges and begins in the settlement agreement by
7    acknowledging that the agreements that we're talking about
8    were ones that obligated him to provide exclusive services
9    to the WWE through the term of the contract which ended in
10   June of 2010.  That he had represented the reason he wanted
11   this release was not so he could be free to go perform for
12   our competitors or other people who do what we do, but
13   solely to play professional football, and then agreed to
14   honor the terms of this contract and comply with them if we
15   agreed not to forfeit his royalties.  And we continued to
16   pay him the royalties he wasn't entitled to because of
17   breach of contract.  And he further agreed in this that
18   through -- in paragraph 3B of this settlement agreement,
19   that he would not license or otherwise grant any third party
20   other than the NFL the right to exploit his name and
21   likeness thereby honoring the exclusivity he had promised.
22   And in paragraph 4A specifically said -- and paragraph 4A is
23   the one that's in question -- that he acknowledges that
24   WWE's consent from his obligation under the agreements was
25   induced by his material representation that he has no

Page 6

091505.txt

⬚

7

1    intention of exploiting such early release in order to
2    compete with WWE in the area of professional wrestling or
3    sports entertainment events.  And then he goes on in a
4    covenant that he will honor that exclusivity through the
5    expiration date of the original agreement.  And further
6    provides that if he violates that we suffered irreparable
7    harm.
8         Now, Mr. Lesnar tried out for football.  He didn't
9    make it.  There was some discussions thereafter where he
10   tried to come back to the WWE, contrary to what was
11   suggested in the brief, as you'll see.  When he came back to
12   the WWE, he came back wanting these ridiculous things that
13   nobody would pay him, and he couldn't make a deal and he
14   brought this lawsuit.  Before this lawsuit was brought, and
15   I think this is important, your Honor, in terms of what is
16   the case or controversy here.  In their summary judgment
17   brief they have went to great length to sort of portray the
18   WWE in a certain way.  That this settlement agreement
19   contains unreasonable broad restrictions in it that are
20   being enforced oppressively by the WWE to the point where he
21   can't, they say, do anything anywhere in the world to make a
22   living.  The results of him only making twelve thousand
23   dollars a year is what they say in their brief.  That's the
24   character that they give this.  And at page eleven of their
25   brief, they say that we've threatened him such that he can't

091505.txt

8

1    work anywhere in the world.  That's not true.  The only
2    thing that happened before we came here today and before
3    this lawsuit, the only thing we know of that Mr. Lesnar did
4    or wanted to do that we have ever taken a position was when
5    he went over to Japan, when he was trying to create a
6    leverage for contract negotiations for his return, and
7    appeared in New Japan Wrestling, in violation of his
8    covenant not to compete.
9           Now, they use that in their brief to try to
10   portray us as taking an unreasonable position.  They say in
11   their brief, at page ten of their summary judgment brief,
12   they make their first statement about that position, about
13   what he did in New Japan, to try to use it to show we're
14   taking an unreasonable position under this agreement.  They
15   said, quote, Despite WWE's suspicions, Lesnar was not
16   compensated for his attendance at a New Japan Pro Wrestling
17   event in Tokyo which he attended as a spectator, end quote.
18          The next place they reference this episode is on
19   page 27 of their brief where they say, quote, The absurd
20   breadth of this restriction is most effectively illustrated
21   by WWE's claim in this litigation that Lesnar was in
22   violation of Section 4A of the settlement agreement when he
23   flew to Japan and was seated in the audience and introduced
24   as a spectator at a wrestling event put on by a Japanese
25   firm in Tokyo.

091505.txt

1        Last statement they make about this, page 27 of

2   their brief, quote, As interpreted by WWE, he cannot even be

3   seen in the audience of a competitor's event regardless of

4   whether he's paid to be there, and then they put in

5   parenthetical, Lesnar was not compensated, or whether he has

6   consented to the use of his name and likeness on camera or

7   otherwise, Lesnar did not consent to such use.

8        So they use his appearance in New Japan in their

9   brief for the purpose of portraying a certain set of facts

10  that is then used to portray our position as unreasonable

11  and oppressive.  We don't think any of what he has said here

12  is true.  We think it's categorically false.  We think he's

13  in possession of evidence that he knows it's false and we're

14  to prove it's false.

15        THE COURT:  But how is it relevant to the summary

16  judgment issues?

17        MR. MCDEVITT:  Well, I think it is relevant, your

18  Honor.  They're the ones that put it in there.  They've

19  raised the issues as a matter of interpretation.

20        THE COURT:  But the general argument on paragraph

21  4 of the settlement agreement is that it's too long in time

22  and too far in geographical extent.  That's basically it,

23  right?

24        MR. MCDEVITT:  It is.  But this settlement

25  agreement term whereby he honors the exclusivity

091505.txt

☐

1   agreement --

2           THE COURT:  We're not arguing the summary judgment

3   today.  We're arguing what discovery could mean.

4           MR. McDEVITT:  I understand that.

5           THE COURT:  What is relevant about that to your

6   being able to oppose that summary judgment?

7           MR. McDEVITT:  Your Honor, it is -- the only issue

8   before the court, I think, in terms of case or controversy,

9   is whether or not that action violates or was within his

10  understanding of what he was prohibited from doing or

11  whatnot, what is his understanding of those prohibitions.

12  He's trying to say in here he doesn't know the breadth, he

13  doesn't know how they're going to be applied.  And you can

14  see he's arguing, geez, they're even saying this position I

15  can't be a spectator in an event.  We haven't taken that

16  position.  We've never taken that position.  And we're

17  entitled to show the court what he actually did to show how

18  we interpret the agreement, that he interpreted it the same

19  way.  In fact, we think the reason he's making up this story

20  about being a spectator is because he knows that what he did

21  was within the intent of what he agreed to do and that this

22  claim that he doesn't know how broad this is is just pretext

23  frankly.

24          THE COURT:  But have you answered my question?

25          MR. McDEVITT:  Well, I think so, your Honor.  They

091505.txt

```
 1    also claim the restriction is so onerous that he can only
 2    make $12,000 a year.  How much did he make when he went over
 3    there to do this?  They claim he wasn't paid.  I mean, it's
 4    not plausible.
 5            THE COURT:  Now, we're talking about something
 6    that's relevant probably to the summary judgment motion
 7    which is does he have other sources of income, can he pursue
 8    other kinds of compensation.  In the usual case that I have
 9    with the covenant not to compete is a salesperson for a
10    company has particular geographical territories for that
11    company, leaves, and has a covenant not to compete for a
12    certain period of time in a certain area.  And then the
13    company comes in and shows why that scope of that
14    geographical restriction is important to the company.  And
15    we try to figure out what is a reasonable restriction.  If
16    the company's business is in Connecticut, to restrict that
17    business in Utah makes no sense, doesn't harm the company.
18    We also look at the period of time.  How long is it.  How
19    long it would take for the company to make up that loss of
20    that employee.  Those are the kinds of issues.  I don't see
21    how appearing at the New Japan event is really relevant to
22    this, but I could be wrong about it.
23            MR. McDEVITT:  Well, your Honor, I understand
24    that's the judicial analysis post employment.  Again, this
25    is a settlement agreement.  We do compete worldwide.  His
```

Page 11

091505.txt

⬜

12

1    exclusivity was worldwide.  This wasn't a man that just

2    performed in Connecticut.  We made him an international

3    star.  And when you make these people international stars,

4    there's a lot of our competitors who want to pawn off the

5    investment and bring them over and put them in their show

6    and advertise that we have WWE stars.  It's a legitimate

7    interest and we will justify this when we get around to

8    filing our summary judgment briefs of why we have these

9    restrictions and these people are, in fact, oure

10   competitors.

11          In fact, we have reason to believe when Mr. Lesnar

12   was at this show that he says he just walked in.  And on the

13   surface, your Honor, just ask yourself, a guy that's

14   supposedly makes $12,000 since he left, you're supposed to

15   believe that he and his wife get on a plane, pay for it in

16   their own money, travel over to Japan to attend a wrestling

17   show in Japan where they just walk in as spectators, pay

18   their hotel bill, pay all the costs over there and they're

19   not compensated.  Does anybody believe that?

20          THE COURT:  That may be relevant as to whether he

21   breached the agreement if it's found to be lawful, but I'm

22   trying to figure out how is much of this relevant to the

23   question of whether the agreement is reasonable both in

24   terms of length and geographic scope.  And you've said one

25   thing that makes some sense to me, and that is his income.

091505.txt

13

 1    In other words, if I have that salesperson comes in and his
 2    income shows that he's making a lot of money through a
 3    different type of work, then it's not as unreasonable as it
 4    might otherwise be.
 5          MR. McDEVITT:  It's also not accurate to tell the
 6    court that he's made twelve thousand dollars since he
 7    left.
 8          THE COURT:  That may be true.  So we'll talk about
 9    the income restrictions.  But the question is all documents
10    concerning the settlement agreement, all documents
11    concerning any communication concerning the settlement
12    agreement with any person, all documents concerning any
13    communication with any professional football team.  Those
14    may be legitimate areas of inquiry for general discovery in
15    this case, but I'm trying to figure out where is the more
16    restricted discovery that's appropriate for your responding
17    to summary judgment.
18          MR. McDEVITT:  I think there's three categories.
19    They say two.  The money's one.  We'll talk a little bit
20    about it.  New Japan, I put a stand alone issue.  And then
21    the third one is this notion that they constructed in their
22    brief that what sports entertainment means is so broad that
23    he can't even work as a commentator for ESPN and all the
24    rest of that.  When we drafted our discovery requests we
25    followed what they said in the summary judgment brief itself

091505.txt

1   to see what evidence there was on these points.

2          THE COURT:  Let's go back to money for a second.

3   You've asked for his income since 2000.

4          MR. McDEVITT:  I don't need that.  Really what --

5          THE COURT:  Let me ask my questions.

6          MR. McDEVITT:  I'm sorry, your Honor.

7          THE COURT:  You've asked for 2000 to 2004.  The

8   settlement agreement is 2004, right?

9          MR. McDEVITT:  Yes.

10          THE COURT: So you don't need that information any

11   longer, between 2000 and 2004?

12          MR. McDEVITT:  We're interested in his

13   post-termination income.

14          THE COURT:  Now we're talking.  Now we're getting

15   somewhere.  We're making some progress.

16          And what about that information about New Japan?

17   Aren't you looking for do you have any agreements with New

18   Japan?  Have you received any remuneration from New Japan?

19   That might be relevant.

20          MR. McDEVITT:  You mean the WWE?

21          THE COURT:  Has Lesnar had those situations with

22   New Japan.  Would that address the issues you're looking

23   for?

24          MR. McDEVITT:  Well, yes, in the sense that we've

25   asked for what was his arrangement when he went over there

091505.txt

15

1   with New Japan.

2        THE COURT:  We're getting closer.

3        MR. McDEVITT:  Did he get compensation?  Was he

4   paid to be there?  We do not believe it's accurate to say

5   that he went there as a spectator.  And we don't think it's

6   fair that he portray us as taking the kind of position that

7   we're so unreasonable that we're saying this man can't even

8   go be a fan.  That's not what he did there, your Honor.

9   We're entitled to prove what he did there.  We're not taking

10  unreasonable positions with this man.  This is a man whose

11  now breached two contracts with us.  Two.

12       THE COURT:  And all I'm trying to do is to address

13  discovery so that you're able to respond to the summary

14  judgment motion in a reasonable way and within a reasonable

15  period of time.  I'm not saying that later on in this case,

16  if it continues, you won't be able to discover these other

17  areas, what was he really doing at the event.  But it seems

18  to me that we can limit that.  Does he have an agreement

19  with New Japan, has he received any money from New Japan.

20  What's the third area.

21       MR. McDEVITT:  I think when you ask for

22  declaratory judgment, as I interpret the law, it's

23  essentially conceded the court's equitable powers.  If he's

24  exercised self help and is going and doing things -- in

25  fact, there's a rumor now he's supposed to appear in New

091505.txt

☐

16

1   Japan in October wrestling.

2        THE COURT:  That deals with the issue of the

3   remedy that's available here.  So I'm just trying to tailor

4   the summary judgment so you have a fair chance to respond to

5   it.  And if you're successful we'll move on to these other

6   discovery issues.  I'm just trying to figure out what you

7   really need to fight off the summary judgment.

8        MR. McDEVITT:  To us, the whole set of

9   circumstances in New Japan, when we explain them to the

10  court, one, gives proper context of our position on

11  interpretation but, two, I think does go to whether he has

12  clean hands sufficient to be asking the court for a

13  declaration of equitable relief.  The court may disagree

14  with us when we put that evidence in.  You may say, well, I

15  don't think that gives him unclean hands.  But they don't

16  even want to give us access to the evidence in the first

17  place to make our defense.  Whether the court accepts it or

18  you don't is the court's call.  But to deny us to the right

19  to get the evidence that we think we can use to explain to

20  the court fully the whole set of circumstances surrounding

21  this controversy seems to me to be wrong.

22        They say in their brief, for example, the income

23  documents, they said we could ask him on all this.  They

24  don't dispute we can question him on all this.

25        THE COURT:  Have you received the 2004 tax year

091505.txt

☐

1   1040 yet?

2          MR. McDEVITT:  No.

3          THE COURT:  It's going to be filed right around

4   now I thought.

5          MR. McDEVITT:  It was -- by his extension he was

6   supposed to file three days after the original close of

7   discovery.  I don't recall what that was at the moment, but

8   I haven't got it in answer to your question.

9          THE COURT:  Why don't I hear from Mr. Centrella

10  and see if we can narrow this down a little bit.

11          Mr. Centrella, what about the income issues since

12  the time of the breach at least?  I'm not saying there was a

13  breach.  At least for the time of the settlement agreement.

14          MR. CENTRELLA:  I agree that income post entry of

15  the settlement agreement between the parties is relevant,

16  but limited to earned income.  So to the extent that

17  Mr. Lesnar is able to earn a meaningful income and there's

18  evidence of that, that would certainly be relevant to the

19  issues of summary judgment.

20          THE COURT:  What are the other sources of his

21  income in general?

22          MR. CENTRELLA:  He has not earned any meaningful

23  income since he left the WWE.  There is about twelve

24  thousand dollars, I believe, give or take a few dollars in

25  income, a small amount of money that he got from the

091505.txt

□

1   Minnesota Vikings for the short time that he was trying out

2   for them.

3           THE COURT:  You're talking earned income?

4           MR. CENTRELLA:  That's earned income, yes.  And a

5   small amount from some other source I think related to that.

6   He has not earned any other income.

7           THE COURT:  What about unearned income?

8           MR. CENTRELLA:  Unearned income?  Well, he has

9   probably some substantial unearned income.  I mean, as the

10  defendant argues, as Mr. McDevitt argues in his papers, we

11  have produced -- first let me say all of the documents that

12  we believe are necessary to show all of the income --

13          THE COURT:  Why don't you answer my questions now

14  too.  I want to know what generally are the sources of his

15  unearned income.

16          MR. CENTRELLA:  He has investments.  He for a

17  number of years was earning very substantial income from the

18  WWE.  So he has some investments.  We produced bank records

19  from June 2003 through June 30, 2005 that show all of the

20  deposits into his bank account.  The substantial bulk of

21  those are from the WWE, because he worked for the first

22  quarter of 2004 and he continued to receive royalty income

23  after that.  The substantial bulk is from the WWE and they

24  have records of that.  But beyond that, he has personal

25  loans from his -- I'm going to say his wife, but I'm not

Page 18

091505.txt

1   sure she is his wife -- his partner, and monies from

2   investment income.  And that is essentially it.

3           Now, our position is that that is not relevant to

4   the inquiry here, because he would have that whether he was

5   working for the WWE or working for some other professional

6   wrestling organization or not.  Those monies are derived

7   from assets that he has.  So we have provided all of the

8   information that shows all the income that he has received

9   since the date of the settlement agreement through June 30,

10  2005.  We can update it certainly.

11          THE COURT:  In earned income?

12          MR. CENTRELLA:  In all income, including earned

13  income.  And we provided W-2's and, I think, 1099 forms for

14  the small amount of earned income he had.  Our position --

15          THE COURT:  Have you given the information about

16  unearned income, though?

17          MR. CENTRELLA:  We haven't given all the

18  information about unearned income, your Honor, because we

19  don't believe it's relevant to anything.  And to have this

20  man have to go through and provide documents pertaining to

21  investments that he's had, you know, and the transactions

22  involving those things is really not relevant.  It's a

23  substantial amount of documentation I would think that's not

24  pertinent to anything here.

25          THE COURT:  What about his 2004 tax return?

091505.txt

☐

1          MR. CENTRELLA:  I believe he's on extension.  He

2     has not filed it yet.  And certainly as soon as it's filed,

3     we will produce it.  I mean, I only learned in the context

4     of this discovery process that he was on extension.  I

5     didn't previously know that.

6          THE COURT:  Do you know when his extension

7     expires?

8          MR. CENTRELLA:  I don't, your Honor.

9          THE COURT:  Does the unearned income, is that

10    relevant to the reasonableness of the restrictions and the

11    covenant not to compete?

12         MR. CENTRELLA:  I don't believe it is.  The

13    unearned income is really a separate issue.  The argument --

14    the key point on the covenant not to compete is this man has

15    an unusual set of skills.  He's got a tremendous physical

16    presence.  He is a professional athlete in the sense and a

17    professional performer.  He's in his 20's.  There's a very

18    short life span for these kinds of people.  If he were not

19    doing this, sure, he could earn a living probably digging

20    ditches, maybe working on a road crew.  But he shouldn't be

21    put to the point of having to do that to earn a living.  And

22    he can't earn the kind of comparable income that he earned

23    at the WWE unless he can do something comparable to it.  And

24    he has a very short window of opportunity in order to do

25    that.

091505.txt

☐

 1          So I'm not sure if I'm answering your question.
 2          THE COURT:  I think you're doing the same thing
 3   that Mr. McDevitt was doing, you're arguing the merits of
 4   the case.  We'll get to that.  I'm not going to foreclose
 5   you from that.  But I just wanted to see if we could reach
 6   some kind of understanding about what information should be
 7   disclosed.  If we can't, I'll order it.
 8          MR. CENTRELLA:  I understand, your Honor, how it
 9   led into that.  I don't think the unearned income is
10   relevant, because investments and things that he did to
11   provide for his future were done as a consequence of income
12   he previously earned.  The only question is whether relevant
13   to the enforceability of the non-compete is whether or not
14   he's capable of earning a comparable income, of pursuing his
15   career.  And the only thing that would reflect that would be
16   earned income.  I mean, if he's earned income from wrestling
17   somewhere else, if he's earned income from some other sort
18   of sports entertainment thing or, really, from any source,
19   earned income would be relevant.  I agree.  But I don't
20   think unearned income is.
21          THE COURT:  What if he had investment in New Japan
22   and was receiving some unearned income through that,
23   wouldn't that be relevant, though, to his relationship with
24   a competitor?  I'm not saying he does.  I have no idea.  But
25   could there be some unearned income that could be relevant?

091505.txt

☐

1          MR. CENTRELLA:  Well, the question of the
2   relationship with New Japan goes to whether or not he has
3   breached the non-compete.  And I've tried to make it pretty
4   clear that our position is that's not on the table for
5   discussion right now.  What's on the table for discussion is
6   is the non-compete enforceable as a matter of law.  If it's
7   not enforceable as a matter of law, whether or not he did
8   things that would otherwise be considered a breach of the
9   non-compete is a moot point.  So if he had a relationship
10  with New Japan where he was invested in the company, for
11  example, that might technically be a breach of the
12  non-compete.  But, again, it's not on the table for
13  consideration now, in our view, given the scope of the
14  issues that have been raised by the summary judgment motion.
15  Virtually all of the -- most of the documents that
16  Mr. McDevitt is talking about pertaining to communications
17  with other wrestling entities or other sports entertainment
18  entities, that sort of thing, all of that goes to try to
19  show that he briefed the non-compete, which we believe is
20  not relevant to this inquiry.
21          So if he derived income, earned income, by
22  working, that's relevant.  I don't think investment income
23  is.
24          THE COURT:  What about the other areas that he's
25  talking about, the New Japan information, for example.

Page 22

091505.txt

1          MR. CENTRELLA:  Again, I think the only thing that
2    would be relevant is if he earned income from New Japan.
3    And we provided all of the information showing what income
4    he has received.  And when I say we have given it all, we
5    have given it all.  If there was a W-2 from New Japan or a
6    1099 from New Japan, we would have produced it.  Certainly
7    Mr. McDevitt has every right to take as much time as he
8    needs to ask Mr. Lesnar at deposition about the financial
9    records we have produced.
10         THE COURT:  Does he have any agreements with New
11   Japan?
12         MR. CENTRELLA:  He does not.  Well -- he has been
13   in communication with New Japan.  He may have an agreement
14   with them as of the present time.
15         THE COURT:  Is that relevant?
16         MR. CENTRELLA:  I don't think it is.  Because,
17   again, at the time he filed the lawsuit he certainly didn't.
18   He has not worked for New Japan.  And, again, it's only
19   earned income that I think is relevant to this inquiry.
20         It may be relevant ultimately to whether or not he
21   breached if your Honor doesn't agree with us that the
22   non-compete is not enforceable, but that's not the issue
23   before the court now.  The issue before the court is whether
24   or not the scope of this thing, given its scope, whether or
25   not it's enforceable as a matter of law.  And I would like

091505.txt

    1   to make one additional point on that.

    2           There is actually a third aspect to it that we

    3   believe renders it unenforceable and that is the substantive

    4   scope.  Mr. Lesnar worked as a professional wrestler for

    5   this organization, primarily in the United States, but as a

    6   professional wrestler.  The scope of this thing extends to

    7   Ultimate Fighting and any other sports entertainment

    8   organization.  If you think about the breadth of that it's

    9   pretty substantial.  In my view, I guess he couldn't drag

   10   the rake around the infield at Yankee Stadium during the

   11   seventh inning stretch because that's sports entertainment.

   12   So it's the substantive scope also we claim is over broad.

   13           THE COURT:  Anything else you wanted to say, Mr.

   14   Centrella?

   15           MR. CENTRELLA:  As I said, I think we've given him

   16   everything that there is to give him pertaining to income.

   17   And if something else comes up as a consequence of the

   18   deposition that I'm not aware of, we would certainly produce

   19   anything that seems to be relevant as well.  I don't think

   20   all the other stuff pertaining to documents or

   21   communications with New Japan or any other sports

   22   entertainment entity is relevant to this inquiry.

   23           THE COURT:  Go ahead.

   24           MR. McDEVITT:  So to clear the record up, I think

   25   Mr. Centrella, when you were questioning him on New Japan

091505.txt

25

    1    indicated that whatever they had was produced.  We got
    2    nothing on it.  Nothing.  Not one document on New Japan.  In
    3    fact, he refused to produce any.
    4           I'd like to address this issue of his unearned
    5    income.  Unfortunately, your Honor, I think sometimes there
    6    is pretext.  I'm not accusing Mr. Centrella.  I want to be
    7    clear about that.  Bank account records that we have been
    8    given here show voluminous transfers of money to Mr. Lesnar
    9    from Rena Mero.  And I'll explain who that is.  He was
   10    referring to the fiancee.  Rena Mero was also at one point
   11    in the WWE a very prominent performer by the name of Sable.
   12    Your Honor may have heard of her.  She was on the cover of
   13    Play Boy.  You don't have to admit anything on that.
   14           THE COURT:  I've heard of her.  I haven't seen
   15    her.
   16           MR. McDEVITT:  That's who we're talking about.
   17           When Mr. Lesnar went to New Japan she accompanied
   18    him.  She's a celebrity in other own right.  It's rather
   19    curious that right after this transaction lots of money
   20    being transferred from Rena Mero's account into Mr. Lesnar's
   21    account, which is now being represented to be a loan.  I
   22    think we're entitled to probe whether that's really a loan
   23    or whether that's the way that they paid Mr. Lesnar money.
   24    Because knowing these two people, they are not going to go
   25    to New Japan on their own money for nothing.  And the bank

091505.txt

☐

26

1    accounts show that.

2         All we have gotten on the so-called earned income,

3    the only financial records we have gotten, tax returns for

4    one year, W-2's, 1099's, and bank statements for

5    Mr. Lesnar's LLC, Brock Lock LLC. And it's certainly true

6    that the money that he got in the one year came from WWE.

7    But it's equally true that there are hundreds of thousands

8    of dollars running through those bank accounts from some

9    source that did not come from the WWE. There hasn't been a

10   single loan document produced. There hasn't been any kind

11   of investment information. And, you know, your Honor, we'll

12   show up for the deposition and I know what will happen.

13   We'll ask Mr. Lesnar, now, that transfer there of $50,000,

14   what is it? I don't remember. Where do we go? We don't

15   have the documents to prove any of this stuff. So if I'm

16   entitled to question him on it, I ought to be entitled to

17   have the source documents to prove what it is or refresh his

18   recollection if he doesn't remember what it was.

19        But, again, we have received nothing about New

20   Japan. If he now has a contractual agreement with them

21   which apparently there's something going on, again, it shows

22   he understands what this agreement's about, this

23   interpretation of it.

24        Thank you, your Honor.

25        THE COURT: Anything else you wanted to say?

091505.txt

&#9633;

 1          MR. CENTRELLA:  Yes, just briefly, your Honor.
 2          Mr. McDevitt has noticed the young lady's
 3  deposition as well and I'm sure fully intends to examine her
 4  at length about anything pertinent to this case.
 5          The financial documents, the bank records we
 6  produced were Brock Lock LLC, which is the vehicle through
 7  which Mr. Lesnar conducts all of his business.  Any income,
 8  any earned income would be in that account.
 9          I disagree with him when he says that not having
10  all of these other records will somehow hamper his ability
11  to ask questions.  He continues to suggest that we are
12  somehow hiding the ball here, that we're lying, we're being
13  less than candid.  And that Mr. Lesnar will walk into his
14  deposition and lie through his teeth.  I'm offended by that.
15  There's a way we do these things.  He can ask the questions.
16  If there's something that does come out that's relevant we
17  will provide it.  I can commit to the court that we will
18  provide it.  But to have him say that he should provide any
19  kind of loan documents, any kind of investment documents,
20  it's a worthless, inappropriate fishing expedition.  And I
21  have a problem with it.
22          THE COURT:  This is what I'm going to order, and
23  we'll talk about the specifics of it.  There seems to be
24  four areas which I think Mr. McDevitt's entitled to.
25          First is, I do believe he's entitled to the

091505.txt

⬜

```
 1    records which show all income, both earned and unearned,
 2    since the date of the settlement agreement.
 3              The second is any documents concerning New Japan.
 4              Third is all agreements with any source for
 5    performing or engaging in sports since the date of the
 6    settlement agreement.
 7              And last would be federal and state tax returns
 8    for the tax years 2003 and 2004.
 9              Are there any questions about that?
10              Those are the areas I want produced.
11              MR. CENTRELLA:  I'm sorry, your Honor.  Could you
12    just restate number three?
13              THE COURT:  Sure.  All agreements between
14    Mr. Lesnar and any source for performing or engaging in
15    sports.
16              MR. McDEVITT:  Your Honor, just so we're clear,
17    when you say sports, do you include professional wrestling
18    within that?
19              THE COURT:  I do.  I'm sorry.
20              MR. McDEVITT:  Thank you.
21              THE COURT:  So that would be including
22    professional wrestling.
23              Is there any lack of clarity there?  Do you need
24    any clarification?
25              MR. CENTRELLA:  Your Honor, we have produced the
```

091505.txt

29

```
 1   2003 tax return.  The 2004 has not been filed yet.  When
 2   it's prepared and filed we will produce it certainly.
 3          THE COURT:  I'll tell you, you know, I'm sure
 4   you're not delaying it for any improper purpose, but I'm not
 5   going to have argument on the summary judgment until that's
 6   filed.
 7          MR. CENTRELLA:  I will talk to Mr. Lesnar's
 8   accountant since that's who we got the records from and find
 9   out the status of that is.
10          MR. MCDEVITT:  That shouldn't be an issues, unless
11   they got another extension.  I know when we looked at the
12   extension, the extension is two or three days after the
13   original end of discovery.  So it should be getting filed.
14          MR. CENTRELLA:  I hadn't focused on it, but I will
15   definitely talk to the accountant and get it clarified.
16          THE COURT:  So the motion to compel is granted and
17   denied, in part, and the production is limited to those
18   documents.
19          Anything else we need to clear up?
20          MR. CENTRELLA:  Not from our perspective.
21          MR. MCDEVITT:  Do we need to adjust the deadlines
22   for completion of discovery?
23          THE COURT:  We probably do.  How long do you think
24   you need to get that information and then take the
25   depositions?
```

091505.txt

```
 1          MR. CENTRELLA:  You know, I don't have a sense how
 2  voluminous that information is.  So I would ask probably, to
 3  be on the safe side, maybe 30 days to provide the
 4  documentation.
 5          THE COURT:  Is that all right with you?
 6          MR. McDEVITT:  Fine.
 7          MR. CENTRELLA:  I hate to delay this, but I don't
 8  want to be in a position where I say two weeks and I can't
 9  get it all together.
10          THE COURT:  So 30 days to produce.
11          MR. SCHWARTZ:  In light of that timing, your
12  Honor, may I suggest that the discovery deadline be extended
13  to, say, November 30th, and that we then have until December
14  31 to submit our opposition to plaintiff's motion for
15  summary judgment?
16          THE COURT:  How do you feel about that, Mr.
17  Centrella?
18          MR. CENTRELLA:  If it's consistent, and I think it
19  is, with the time frames that were set forth in your
20  original order, I don't think I have a problem with that.
21          THE COURT:  So I'll order that too as well.
22          Last question I had for all of you is whether
23  there's any purpose to having a settlement conference in
24  this case with either me or a magistrate judge because, you
25  know, even when you've done this discovery, you've argued
```

091505.txt

1   the summary judgment, I usually take some time and try and
2   figure out the answer to the summary judgment.  So the
3   chance of you getting as quick of a decision on this, Mr.
4   Centrella, as you'd like or your client would like is
5   difficult.  So it would seem that since you have had some
6   discussions in the past about this, maybe there's some hope
7   that the parties could come together.  I'm happy to try to
8   set something up if you think there's any hope at all.  If
9   there's not, that's fine, we can just proceed on the summary
10  judgment.  But I've never seen a case in my time that's a
11  slam dunk either way, to use a different sports metaphor.
12          MR. CENTRELLA:  I wouldn't disagree with that,
13  your Honor.  I mean, from my perspective all I can say is I
14  will certainly broach the topic with my client.
15          THE COURT:  What do you think, Mr. McDevitt?
16          MR. McDEVITT:  Candidly, Mr. Lesnar and
17  Mr. McMahon had personal meetings pursuant to our agreement
18  that there would be settlement discussions.  So I don't want
19  to go into the substance of them.  They didn't end in an
20  agreement.  We thought it would.  And if Mr. Lesnar is now
21  serious about planning to go to contract with New Japan,
22  that's going to make it even worst.  He is a unique athlete.
23  We wanted to get him back.  He is, unfortunately, a young
24  man who doesn't honor his contract.  So I don't think right
25  now that it would be productive.  I will ask my client, and

Page 31

091505.txt

⬚

1  Mr. Centrella will, but we went down the route and it didn't
2  get us anywhere.
3          THE COURT:  How much time do you think you need to
4  talk to your respective clients and know a little better?
5          MR. CENTRELLA:  Couple of days, by the beginning
6  of next week.
7          MR. McDEVITT:  It's easy for me, I just call
8  Mr. McMahon.  I'll just call him tomorrow and let the court
9  know.
10         THE COURT:  Maybe Monday, if you could both call
11  me on Monday, sometime in the afternoon, I'll try to make
12  myself available and talk about it.
13         MR. McDEVITT: Do you want us to get on the phone
14  and call you?
15         THE COURT:  Yes.
16         MR. CENTRELLA:  That's fine, your Honor.
17         THE COURT:  Anything else that we should talk
18  about then?
19         MR. CENTRELLA:  I think we're all set.
20         THE COURT:  Thank you all.  We'll be in recess
21  then.
22         (Recess.)
23
24
25

091505.txt

33

```
 1              C E R T I F I C A T E
 2
 3          I, Martha C. Marshall, RMR, CRR, hereby certify
 4   that the foregoing pages are a complete and accurate
 5   transcription of my original stenotype notes taken in the
 6   matter of LESNAR V. WWE, INC., which was held before the
 7   Honorable Christopher F. Droney, U.S.D.J, at 450 Main
 8   Street, Hartford, Connecticut, on September 15, 2005.
 9
10
11                          _____
                            Martha C. Marshall, RMR,CRR
12                          Official Court Reporter.
13
14
15
16
17
18
19
20
21
22
23
24
25
```